————————————————————————————————

RANDALL & HEATHER LOZAR,
JUAN & ERICA CORTEZ,
RANDY T. BAKER & MARCY BAKER,
SONNY & DEANNA BUSTILLOS,
JUANITA & JUAN RODRIGUEZ,
DALE ZUIDEMA, DAVID NAUTA,
DANIEL & NYOKA MARTINEZ,
HAROLD & DEANA HICKS,
JENNIFER HICKS & CLIFTON HICKS,
JANICE REED,
STEPHEN MARTIN and FRANCES MARTIN,
JANE JACOBSON and LEON STAM,
NOEMI DIAZ MIGUEL, SIGFREDO ARRIOLA,
SAN JUAN BENEVIDES, MARTIN DE LUCAS,
FELIPA DIAZ, ANNE HANSON, VICENTE JAMES,
ELENO DIAS, ROGER AND MICHELLE MARTIN,
and FRANCISCO AND MARIA RODRIGUEZ,

Plaintiffs,

v.

BIRDS EYE FOODS, INC.,

Defendant.

Case No. 1:09-cv-10

HONORABLE PAUL MALONEY

————————————————————————————————

# OPINION and ORDER
## *Lozar 3*

**Granting in Part and Denying in Part the Motion to Dismiss Parts of Count One and Two:**

Dismissing Count 1 (Negligence) for Failure to State a Claim to the Extent that
it Relies on Negligence *Per Se* Consisting of Alleged Violation of the SDWA

Declining to Dismiss Count 1 (Negligence) for Failure to State a Claim to the Extent that
it Relies on Negligence *Per Se* due to Alleged Violation of CERCLA, RCRA, and/or Michigan NREPA

<u>Dismissing Count 2 (Remediation/Response Costs) for Failure to State a Claim to the Extent that</u>
it Relies on Violation of the SDWA

<u>Declining to Dismiss Count 2 (Response/Remediation Costs) to the Extent that</u>
it Seeks Costs Attributable to Alleged Violation of CERCLA, RCRA, and/or Michigan NREPA

<u>Permitting the Plaintiffs to File a Third Amended Complaint</u>
Providing Sufficient Specific Allegations Regarding Each Plaintiff's Actual Past Incurrence of Response
Costs and Regarding their Compliance with the National Contingency Plan

Randall and Heather Lozar and thirty-three other plaintiffs (collectively "the Lozars") reside or own property near a fruit-processing plant owned and operated by defendant Bird's Eye Foods, Inc. ("BEF") in Fennville, Michigan. *See* 2d Am Comp ¶¶ 1-29 and 40. BEF has not denied that it meets any pertinent federal or state statutory definitions of owner/operator of the Fennville facility. *See, e.g.,* 42 U.S.C. § 9601(20)(A) (CERCLA definition of owner or operator, "in the case of an onshore facility", simply as "any person owning or operating such facility"); 42 U.S.C. § 9601(20)(D) (excluding units of State or local government from definition of owner/operator under certain circumstances).

BEF's operations at the Fennville facility creates wastewater which contains organic matter from the fruit, such as dissolved sugar and suspended solids, and it disposes of this wastewater by spraying it onto its fields ("spray irrigation"), which are east of the facility and south of the road called M-89. *See* 2d Am Comp ¶¶ 40 and 50. The Lozars allege that since the BEF facility opened, its spray irrigation has caused elevated levels of "contaminants" in the soil and "groundwater" on and around the facility premises. *See* 2d Am Comp ¶¶ 40 and 51. *See also* 42 U.S.C. § 9601(12) (CERCLA definition of groundwater as "water in a saturated zone or stratum beneath the surface of land or water"). CERCLA explains that a pollutant or contaminant includes, but is not limited to,

any element, substance, compound, or mixture, including disease-causing agents, which after release into the environment and upon exposure, ingestion, inhalation, or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will or may reasonably be anticipated to cause death, disease abnormalities, cancer, genetic mutation, physiological malfunctions (including malfunctions in reproduction), or physical deformations, in such organisms or their offspring . . . .

42 U.S.C. § 9601(33). CERCLA provides that the term contaminant does not include "petroleum, including crude oil or any fraction thereof which is not otherwise specifically designated or listed or designated as a hazardous substance" under 42 U.S.C. § 9601(14)(A)-(F), nor does it include "natural gas, liquified natural gas, and synthetic gas of pipeline quality (or mixtures of natural gas and such synthetic gas)." 42 U.S.C. § 9601(33).

In addition to the spray irrigation, the Lozars also allege that there are at least two other potential sources of contaminants emanating from the BEF facility, including iron, manganese, arsenic, chloride, and sodium: at least one allegedly unpermitted and undocumented landfill on BEF's property, created and used by BEF; and cans, fruit-pit waste, and other debris that BEF has buried in the soil of the facility. *See* 2d Am Comp ¶¶ 41-43.

The Lozars allege that the spray irrigation at the facility has caused a phenomenon known as "groundwater mounding," which they describe as "an outward and upward expansion of the free water table caused by shallow reinjection which can alter flow rates and direction." The groundwater mounding has allegedly caused the contaminants to spread in directions different than they would have spread otherwise. *See* 2d Am Comp ¶¶ 45-46. As a result of the spray irrigation and other causes of contaminant emission and migration, the Lozars allege, residential wells belonging to plaintiffs and others "down-gradient" from the BEF facility do not meet accepted residential water-quality criteria, and the water has also developed odors, coloration, and fixture

staining which would not have occurred otherwise. *See* 2d Am Comp ¶ 47; *id.* ¶ 311 (San Juan-Benevides' water has a bad taste, an odor like rotten eggs and sulfur, and is often brown);

By letters dated between May 8, 2008 and July 24, 2008, BEF notified plaintiffs and other Fennville residents that water had migrated from their facility off their premises, and in some cases plaintiffs received MDEQ letters stating that their drinking water is contaminated, *see* 2d Am Comp ¶¶ 49 and 59 (Lozars); *id.* ¶ 155 (Deana and Harold Hicks received BEF letter dated July 24, 2008); *id.* ¶ 130 (Nauta received BEF letter 4-5 months before 2d amended complaint filed); *id.* ¶ 184 (Reed received letter from BEF on unspecified date); *id.* ¶ 195 (Stephen Martin received MDEQ letter stating water is contaminated); *id.* ¶ 211 (Jacobson and Stam received MDEQ letter stating water is contaminated); *id.* ¶ 283 (Noemi Miguel received MDEQ letter in May or June 2008 stating water is contaminated); *id.* ¶ 383 (the Martins received MDEQ letter on unspecified date regarding contamination); *id.* ¶ 398 (Francisco and Maria Rodriguez received BEF letter cautioning that water might be contaminated).

The Lozars acknowledge that there may be a layer of "glacial till" – poorly sorted sand, silt, and clay of glacial origin – which may act as a confining layer between the upper and lower aquifers, thereby ruling out BEF as the source of some of the contaminants, but they point out that environmental investigation of the affected land is ongoing. *See* 2d Am Comp ¶¶ 44 and 49. After sampling both groundwater and the drinking water of plaintiffs and other Fennville residents, BEF notified them (on unspecified dates) that groundwater sampling has revealed elevated levels of arsenic and manganese which exceed the State of Michigan's drinking standards. *See* 2d Am Comp ¶¶ 52, 54, 65 (arsenic in Lozars' drinking water), 70 (testing of Lozars' drinking water).

The Lozars allege that their water emits a foul odor and causes rust stains to accumulate on

everything it touches, while the Cortezes allege that their drinking water smells like rotten eggs and is very discolored and dirty-looking, *see* 2d Am Comp ¶¶ 67, 80, and the Martinezes likewise allege that their drinking water is yellow, cloudy and smells like rotten eggs, and they had to replace their water heater, plumbing and water lines due to the contaminated water, *id.* ¶¶ 144-46. The Rodriguezes allege that their water has a high iron content and stains everything that it touches, *id.* ¶ 105, while DeLucas alleges that his water "has a strange color and flavor" and cannot be used for drinking or any other purpose, *id.* ¶¶ 327-328.

As for symptoms allegedly related to groundwater contamination, Mr. Lozar complains that he developed chest pains while living at his home near the BEF facility and that the pains stopped after he stopped drinking the water from his well. *See* 2d Am Comp ¶¶ 71-72. Plaintiff Erica Cortez alleges that she suffered clotting in her ovaries and an inflamed liver and pancreas and that her physician was unable to identify the cause of these conditions, and that the Cortezes' dog developed a massive lump in his neck after drinking their water. *See* 2d Am Comp ¶¶ 82-83. Plaintiff Juanita Rodriguez has recurring joint problems, has lost a significant amount of weight, and developed very dry skins and "large bumps" shortly after moving in; her husband Juan has developed a severe rash on his hands and all over his body; her daughter Jsenia lost large amounts of hair while living at the residence; her granddaughter M.V. has developed skin blemishes which her physician has been unable to diagnose and treat; and several of their pets who drank their water became sick and died. *See* 2d Am Comp ¶¶ 107-112 and 114. About seven or eight years before this complaint was filed, plaintiff Nyoka Martinez developed clogged arteries and both of her legs had to be amputated, but her physicians were unable to determine the cause of her medical conditions. *Id.* ¶ 147-48. Plaintiff Felipa Diaz alleges that she has suffered heart disease, thyroid problems, heartburn, a swollen liver,

and hair loss; her relative Martha has suffered heartburn and high cholesterol; and Juvencio has suffered twenty years of hair loss, as well as dementia symptoms which she believes may be Alzheimer's, *id.* ¶ 342. Finally, the Rodriguezes have suffered hair loss, heartburn, and heart disease. *Id.* ¶¶ 402-403.

For more than 18 months prior to the filing of the second amended complaint, BEF provided bottled drinking water to plaintiffs and other Fennville residents. *See* 2d Am Comp ¶ 55, ¶ 62 (Lozars have received bottled water from BEF since May 14, 2008), *id.* ¶ 79 (Cortezes since unspecified date), *id.* ¶ 88 (Bakers since June 2008); *id.* ¶ 102 (Rodriguezes since September 2008); *id.* ¶ 132 (Nauta since unspecified date); *id.* ¶ 143 (Martinezes since August 2008); *id.* ¶ 156 (Deana and Harold Hicks since "spring 2008"); *id.* ¶ 168 (Clifton and Jennifer Hicks since unspecified time); *id.* ¶ 185 (Reed since beginning of October 2008); *id.* ¶ 196 (Stephen Martin since unspecified date); *id.* ¶ 204 (Frances Martin since June 2008); *id.* ¶¶ 212-213 (Jacobson and Stam since September 2008); *id.* ¶ 223 (Gonzalez since September or October 2008); *id.* ¶ 236 (Diana Martinez received nine jugs of water from BEF in January 2009); *id.* ¶ 244 (Morales since November 2008); *id.* ¶ 260 (BEF told George on unspecified date that it would provide him with bottled water, but it never has); *id.* ¶¶ 284-85 (Noemi Miguel since April 2008 but ten bottles monthly instead of the fifteen she requested); *id.* ¶ 309 (San Juan-Benevides since August 2008).

All the plaintiffs allege that the groundwater contamination and resultant health risks and expense have rendered their houses unmarketable despite the efforts of many plaintiffs to sell. *See* 2d Am Comp ¶¶ 63, 66, 68-69, 73 (the Lozars' house); *id.* ¶¶ 81 & 84 (the Cortezes' house); *id.* ¶¶ 88 & 90 (Bakers' house); *id.* ¶ 97 (the Bustillos' house); *id.* ¶¶ 115-116 (the Rodriguezes' house); *id.* ¶¶ 138-140 (Nauta's house); *id.* ¶ 152 (the Martinezes' house); *id.* ¶ 164-165 (Deana and Harold

Hicks' house); *id.* ¶ 180 (Clifton and Jennifer Hicks' house); *id.* ¶¶ 189-190 (Reed's house); *id.* ¶¶ 199-200 (Stephen Martin's house has a State Equalized Value of only $36,000 and he cannot sell it); *id.* ¶ 208 (Frances Martin's house); *id.* ¶ 217 (Jacobson and Stam's house); *id.* ¶ 231 (Benevides' house); *id.* ¶¶ 234 and 237-238 (Diana Martinez's son and daughter moved out a year ago, and she wants to move too but cannot sell); *id.* ¶ 253 (Morales' house has SEV of $95,000 but he cannot sell); *id.* ¶¶ 268-69 (George's home has SEV of only $26,000 but he cannot sell); *id.* ¶¶ 289-290 (Noemi Miguel estimates her house is worth $120,000 but she cannot sell it); *id.* ¶¶ 303 and 305 (Arriola tried to sell house in 2007 but buyers were deterred by concerns about the water, and he still cannot sell it); *id.* ¶¶ 319-20 (San Juan-Benevides' house was worth $150,000 "before the water went bad" but now he cannot sell it); *id.* ¶¶ 330-331 (DeLucas's house is valued at about $170,000 but he cannot sell it); *id.* ¶¶ 357-358 (Hanson's house was valued at only $18,400 when she moved and she was unable to sell it); *id.* ¶¶ 368-369 (Jaimes has tried to sell his house for two years but cannot even list it for sale due to the water); *id.* ¶ 378 (Eleno Dias is unable to list house for sale); ¶ 394 (Roger and Michelle Martin cannot sell house and its value has decreased significantly due to water). Plaintiff Zuidema, who has owned a 20-acre farm in Fennville for 13 years and used to rent the house for rental income, alleges that groundwater contamination has prevented him from renting it for at least a year and a half. *See* 2d Am Comp ¶¶ 118-122 & 24.

Finally, many of the plaintiffs allege that an unusual number of their household pets died, suffered severe medical maladies, or gave birth to deformed offspring, while living in their Fennville homes and after drinking the water from their wells. *See, e.g.,* 2d Am Comp ¶ 83 (Cortezes' dog "developed a massive lump in his neck"); *id.* ¶ 134 (Nauta's dog, which he had for only a year, died); *id.* ¶ 149 (the Martinezes had one dog die and another develop sores from unknown causes);

*id.* ¶ 162 (Deana and Harold Hicks' dogs had unspecified "health problems which have started to improve after they stopped drinking the contaminated water"); *id.* ¶ 176-177 )Clifton and Jennifer Hicks' dog became ill after drinking the contaminated water but improved since it started drinking only bottled water, and more than 65 goldfish died in the contaminated water); *id.* ¶ 215 (Jane Jacobson and Leon Stam's nine-year-old dog and five-year-old cat "inexplicably" died); *id.* ¶ 230 (one of San Juan Benevides's dogs gave birth to deformed puppies and died); *id.* ¶ 265 (Monroe George's goat died from "stones" which he believes were cause by salt in the water); *id.* ¶ 301 (Arriola's dog suffered unexplained hair loss last year); *id.* ¶ 353-356 (Hanson's dog was sick and lethargic while drinking contaminated water but seemed more playful and alert after the family moved, and when it gave birth in January 2009, half of its puppies died inexplicably); *id.* ¶ 392 (Roger and Michelle Martin's two dogs died after drinking the water, one with seizures and the other with cancer).

BEF denies responsibility for any groundwater contamination. *See* 2d Am Comp ¶ 53.

The Lozars bring this diversity[1] environmental-protection action asserting a state common-law claim for negligence (count one), a claim for recovery of response/remediation costs under federal and state environmental statutes (count two), and another state common-law claim (count three) which is not the subject of the instant opinion. Pursuant to FED. R. CIV. P. 12(b)(6), BEF moves to dismiss *part* of count one of the second amended complaint, which asserts a claim for

---

[1]

BEF has not disputed the Lozars' allegations that every one of the plaintiffs is a domiciliary of Michigan, and that BEF is incorporated in Delaware and maintains its principal place of business in New York. *See* 2d Am Comp ¶¶ 1-29 (plaintiffs) and 30 and 32 (defendant). Nor has BEF disputed the Lozars' allegation that more than $75,000 is at stake exclusive of interest, fees and costs. *See id.* ¶ 37. Accordingly, until and unless BEF presents evidence or the record discloses otherwise, the court assumes *arguendo* that diversity jurisdiction exists.

negligence, including negligence *per se* based on BEF's alleged violation of the federal Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA"); the federal Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.* ("RCRA"); the federal Safe Drinking Water Act, 33 U.S.C. § 1251 *et seq.* ("SDWA"); and Michigan's Natural Resources Environmental Protection Act, MICH. COMP. LAWS § 324.101 *et seq.* ("NREPA").

Also pursuant to FED. R. CIV. P. 12(b)(6), BEF moves to dismiss *part* of count two, which asserts a claim for Remediation and Response Costs which some or all of the plaintiffs allegedly incurred due to BEF's alleged violation of these same four statutes.

BEF filed this motion to dismiss on October 31, 2009; the Lozars filed an opposition brief on October 31, 2009; and BEF filed a reply brief on November 13, 2009. *See* Doc. Nos. 33 & 34, 36 and 37. More than a month has passed since BEF filed its reply brief, and the Lozars have not sought leave to file a sur-reply.

For the reasons that follow, the court will grant in part and deny in part BEF's motion to dismiss portions of counts one and two of the second amended complaint. Namely, the court will dismiss count one (negligence) to the extent that it relies on alleged negligence *per se* consisting of BEF's violation of the federal statute SDWA, but not to the extent that it relies on alleged negligence *per se* consisting of BEF's violation of CERCLA, RCRA and/or Michigan statute. The court likewise will dismiss count two (Remediation/Response Costs) to the extent that it relies on BEF's alleged violation of the SDWA, but not to the extent that it seeks costs incurred due to BEF's alleged violation of CERCLA, RCRA, and/or Michigan statute. BEF has not sought dismissal of count three.

<u>The Original Complaint and the First Amended Complaint.</u>

The Lozars and seventeen other plaintiffs filed the six-count original complaint in January 2009, asserting state-law claims labeled "Negligence Per Se" (Count One, Comp ¶¶ 160-172), Remediation (Count Two, ¶¶ 173-184), Nuisance (Count Three, ¶¶ 185-197); Trespass (Count Four, ¶¶ 198-207), "Personal Injuries" (Count Five, ¶¶ 208-217), and Negligence (Count Six, ¶¶ 218-223). BEF moved to dismiss all of the original complaint except Count Three, Nuisance. *See* Doc. No. 1. With the consent of defendant BEF, *see* Doc. No. 2, the Lozars filed a first amended complaint on March 1, 2009, *see* Doc. No. 5.

The court determined that the first amended complaint did not meet the Lozars' burden of establishing the complete diversity of citizenship required for jurisdiction. Accordingly, the court dismissed the first amended complaint without prejudice, denied without prejudice as moot the motion to dismiss that complaint, and authorized the Lozars to file a second amended complaint which cured the jurisdictional insufficiency. *See* Doc. No. 14, *Lozar v. Bird's Eye Foods, Inc.*, No. 1:2009-cv-10, 2009 WL 1441584 (W.D. Mich. May 18, 2009) (Maloney, C.J.) ("*Lozar 1*").

In the order dismissing the first amended complaint, the court also noted four acknowledgments made by the Lozars in their brief opposing the mooted motion to dismiss. First, the Lozars stated that they did not object to the dismissal of count one of the first amended complaint, negligence *per se*, as an independent claim, so long as its allegations and the *per se* theory of liability were still available in support of its negligence claim. *Lozar 1*, 2009 WL 1441584 at *3. Second, the Lozars acknowledged that count two, remediation, was subject to dismissal without prejudice under Fed. R. Civ. P. 12(b)(1) for failure to exhaust administrative remedies, but reserved the right to re-file the remediation claim when they did exhaust those remedies. *Lozar 1*,

2009 WL 1441584 at *4. Third, the Lozars stipulated to the dismissal of count five, "Personal Injuries", so long as its factual allegations and legal theories remained available in support of its negligence claim. *Id.* Fourth, the Lozars "stipulate[d] to the dismissal of their claim for punitive damages as such an award is impermissible under Michigan law." *Id.* (quoting Lozars' Br. in Opp. to MTD Orig. Comp. ¶ 1 at 2). Consistent with the Lozars' acknowledgments, the court ordered that any second amended complaint *not* include as independent counts the claims then denominated as Negligence Per Se, Remediation, and Personal Injuries, and that it *not* include a request for punitive damages. *See Lozar 1*, 2009 WL 1441584 at *4.

The Second Amended Complaint.

After some motion practice regarding leave to amend the complaint (Doc. Nos. 15-24), the Magistrate Judge granted the Lozars leave to file a second amended complaint (Doc. No. 30), and they did so on September 22, 2009 (Doc. No. 31). On October 13, 2009, BEF filed an answer to the second amended complaint, along with affirmative defenses (Doc. No. 32). Consistent with the court's order, the second amended complaint does not assert separate claims for "personal injuries" or *res ipsa loquitur* or "negligence per se". The second amended complaint no longer contains a separate count seeking punitive damages, but the Lozars do seek "exemplary damages", *see, e.g.,* 2d Am Comp ¶ 435 (in count one, negligence). The Lozars do re-assert a claim for remediation/response costs, however, apparently because they take the position that they exhausted their administrative remedies in the interim; BEF has not moved to dismiss the second amended complaint's remediation/response-costs claim for lack of exhaustion.

## LEGAL STANDARD

### Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

Rule 12(b)(6) motions turn purely on legal issues, not an assessment of the evidence. *Griffin*, 2008 WL 4741738 at *2 (citing *Technology Recycling Corp. v. City of Taylor*, 186 F. App'x 624, 640 n.5 (6th Cir. 2006) (Griffin, J.) ("*Tech Rec*") and *Thomas v. Arn*, 474 U.S. 140, 150 n.8 (1985) ("[M]otions for judgment on the pleadings and dismissal for failure to state a claim on which relief can be granted . . . consist exclusively of issues of law.")).

"Such motions 'presume as a legal matter the lack of any need for an evidentiary hearing . . .'" *Griffin*, 2008 WL 4741738 at *3 (citing *US v. Raddatz*, 447 U.S. 667, 693-94 (1980)). The court must accept all of the complaint's factual allegations as true and construe the complaint in the light most favorable to the plaintiff. *Tech Rec*, 186 F. App'x at 640 n.5 (citing *PONI, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 697 (6th Cir. 2005)); *see also Bohanan v. Bridgestone/Firestone No. Am. Tire, LLC*, 260 F. App'x 905, 906 (6th Cir. 2008) (citing *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 511-12 (6th Cir. 2001)). But the court need not draw unwarranted factual inferences or accept the plaintiff's *legal* conclusions. *Bohanan*, 260 F. App'x at 906 (citing *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999)).

And each claim's factual allegations must *plausibly* suggest a viable claim; the claim must be plausible and not merely conceivable. *Griffin*, 2008 WL 4741738 at *3 (citing *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 455 (6th Cir. 2007) (en banc) (Sutton, J.) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, –, 127 S.Ct. 1955, 1974 (2007))). "The 'factual allegations must be enough to raise a right to relief above the speculative level'", not merely create a "'*suspicion* of a legally cognizable cause of action . . . .'" *Bishop v. Lucent Technologies, Inc.*, 520 F.3d 516, 519 (6th Cir.

2008) (quoting *Twombley*, 550 U.S. at –, 127 S.Ct. at 1974) (internal alterations omitted)).[2] There

must be either direct of inferential allegations regarding all the material elements of each claim.

*LULAC v. Bredesen*, 500 F.2d 523, 527 (6th Cir. 2007) (McKeague, J.) (citing *Twombley*, 550 U.S.

at –, 127 S.Ct. at 1969).

Our Circuit cautions that district courts should not overstate the hurdle that *Twombley*

establishes for plaintiffs to survive a Rule 12(b)(6) or Rule 12(c) motion:

> In *Erickson v. Pardus*, 550 U.S. [89], 127 S.Ct. 2197 . . . (2007) [(p.c.)], decided two
> weeks after *Twombley*, however, the Supreme Court affirmed that "Federal Rule of
> Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim
> showing that the pleader is entitled to relief.' Specific facts are not necessary; the
> statement need only 'give the defendant fair notice of what the . . . claim is and the
> grounds upon which it rests.'" *Id.* at 2200 (quoting *Twombley*, 127 S.Ct. at 1964).
> The opinion in *Erickson* reiterated that "when ruling on a defendant's motion to
> dismiss, a judge must accept as true all of the factual allegations contained in the
> complaint." *Id.* (citing *Twombley*, 127 S.Ct. at 1965).
>
> We read the *Twombley* and *Erickson* decisions in conjunction with one another when
> reviewing a district court's decision to grant a motion to dismiss for failure to state
> a claim or a motion for judgment on the pleadings pursuant to Federal Rule of Civil
> Procedure 12.

*Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 550 (6th Cir. 2008) (Griffin, J.) (Paragraph break

---

[2]

Until 2007, our Circuit followed the standard set forth in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), which directed courts to grant a 12(b)(6) motion "when it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint." *Taylor v. Sampson*, 2008 WL 2923435, *2 n.3 (W.D. Mich. July 25, 2008) (Maloney, J.).

In *Twombley* (2007), the Court "retired the 'no set of facts' formulation of the Rule 12(b)(6) standard and dismissed a . . . complaint because it did not contain facts sufficient to 'state a claim to relief that is plausible on its face.'" *Griffin*, 2008 WL 4741738 at *3 n.1 (quoting *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 337 n.4 (6th Cir. 2007) (quoting *Twombley*, 550 U.S. at –, 127 S.Ct. at 1974)). *See also Casden v. Burns*, 306 F. App'x 966, – n.5 (6th Cir. 2009).

"In some cases, *Twombley* may make it easier . . . to grant 12(b)(6) than the *Conley* standard." *Taylor*, 2008 WL 2923435 at *2 n.3.

added) (quoting *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295-96 (6th Cir. 2008) (footnote omitted)) (other internal quotation marks and alterations omitted).  Nonetheless, "[w]hile a complaint need not contain detailed allegations, [it] must include more than mere labels and conclusions." *Petros v. Sampson*, 2009 WL 2761425, *2 (W.D. Mich. Feb. 4, 2009) (Edgar, J.) (citing, *inter alia*, *Twombley*, 550 U.S. at –, 127 S.Ct. at 1965).

Ultimately, "'a claim has facial plausibility when the party seeking relief 'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *US v. Washington State DOT*, – F. Supp.2d –, –, 2009 WL 2985474, *3 (W.D. Wash. Sept. 15, 2009) (quoting *Ashcroft v. Iqbal*, – U.S. –, –, 129 S.Ct. 1937, 1949 (2009) (J. Kennedy for the Court, joined by C.J. Roberts, and JJ. Scalia, Thomas, and Alito)).

When considering whether to grant a Rule 12(c) or 12(b)(6) motion, the court primarily considers the complaint's allegations, but may also take into account items appearing in the record and attached exhibits without converting it into a motion for summary judgment.  *Poly-Flex Const., Inc. v. NTH, Ltd.*, 582 F. Supp. 892, 901 (W.D. Mich. 2008) (Maloney, C.J.) (citing, *inter alia*, *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001)).  The court may also consider, without converting the 12(b)(6) motion into a motion for summary judgment, "matters of public record (e.g. pleadings, orders and other papers on file in another action pending in the court; records or reports of administrative bodies; or the legislative history of laws, rules or ordinances) as long as the facts noticed are not subject to reasonable dispute." *Pakootas v. Teck Cominco Metals, Ltd.*, 632 F. Supp.2d 1029, 1032 (E.D. Wash. 2009) (citing *Intri-Plex Techs., Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007)); *accord River Village West, LLC v. Peoples Gas Light & Coke Co.*, 618 F. Supp.2d 847, 850 (N.D. Ill. 2008) (on Rule 12(c) or 12(b)(6) motion, "the court may take judicial

notice on matters of public record") (citing *US v. Wood*, 925 F.2d 1580, 1581-82 (7th Cir. 1981)).

**DISCUSSION:**
<u>Count 1, Claim for Michigan Common-Law Negligence</u>

Under Michigan common law, a plaintiff seeking to recover for ordinary negligence must establish four elements: (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty, (3) causation, and (4) damages. *See Apsey v. N.W. Kent Mech. Co.*, 2009 WL 4724252, *4 (Mich. App. Dec. 10, 2009) (p.c.) (P.J. Beckering, Cavanagh, M.J. Kelley) (citing *Case v. Consumers Power Co.*, 615 N.W.2d 17, 20, 463 Mich. 1, 6 (Mich. 2000)).

The Michigan Court of Appeals has held that "'[i]f no duty is owed by the defendant to the plaintiff, an ordinance [or statutory] violation committed by the defendant is not actionable as negligence.'" *Sidhu v. Hansen*, 2009 WL 3683315, *3 (Mich. App. Nov. 5, 2009) (p.c.) (C.J. Saad, Fitzgerald, Beckering) (quoting *Stevens v. Drekich*, 443 N.W.2d 401, 403, 178 Mich. App. 273, 278 (Mich. App. 1989) (citing *Johnson v. Davis*, 402 N.W.2d 485, 489, 156 Mich. App. 550, 555-56 (Mich. App. 1986) ("[W]hile the Davises may have violated city ordinances and may be liable to the city for any violations, there is no duty imposed by statute or under common law which would render them liable to the plaintiffs, since a predecessor in title is not liable for injury due to defective premises."))).

"In other words, 'violation of an ordinance, without more, will not serve as the basis for imposing a legal duty cognizable in negligence theory.'" *Sidhu v. Hansen*, 2009 WL 3683315, *3 (Mich. App. Nov. 5, 2009) (C.J. Saad, Fitzgerald, Beckering) (quoting *Ward v. Franks Nursery & Crafts, Inc.*, 186 Mich. App. 120, 135, 463 N.W.2d 442, 450 (Mich. App. 1990)); *see also Brooks v. Starr Commonwealth*, 2009 WL 1507320, *2 (Mich. App. May 28, 2009) ("The mere fact that a

defendant's conduct may have violated a statute does not demonstrate that [it] owed a duty of care" to the plaintiff.) (citing *Cipri v. Bellingham Frozen Foods, Inc.*, 596 N.W.2d 620, 628, 235 Mich. App. 1, 16 (Mich. App. 1999)).

However, once the plaintiff establishes that the defendant owed him a duty of care, evidence that the defendant violated a relevant statute or ordinance may constitute *prima facie* evidence that the defendant breached that duty. *See Brooks v. Starr Commonwealth*, 2009 WL 1507320, *2 (Mich. App. May 28, 2009) (p.c.) (P.J. Borrello, Murray, Fort Hood) ("[O]nce a duty is found, the violation of the statute may demonstrate *prima facie* evidence of negligence.").

Whether a violation of a statute constitutes evidence of negligence depends on the statute's purpose and the class of persons it was designed to protect. *See Brooks*, 2009 WL 1507230 at *2 (citing *Cipri*, 235 Mich. App. at 16, 596 N.W.2d at 628). Specifically, under Michigan law, proof that a defendant violated a statute sets up a rebuttable presumption of negligence if (1) "the purpose of the [statute] was to prevent the type of injury and harm actually suffered" and (2) the plaintiff was "within the class of persons which [sic] the [statute] was designed to protect." *Cipri*, 596 N.W.2d at 628, 235 Mich. App. at 16 (quoting *McKnight v. Carter*, 144 Mich. App. 623, 636, 376 N.W.2d 170 (Mich. App. 1985) and citing *Phillips v. Deihm*, 213 Mich. App. 389, 396-98, 541 N.W.2d 566 (Mich. App. 1995)). In *Cipri*, for example, a lake-owner sued various companies for negligence and other causes of action against companies which were allegedly responsible for leachate from fermenting cornhusks flowing into his lake and killing all aquatic life. The Michigan Court of Appeals held that the defendants' violations of the former Michigan Environmental Protection Act ("MEPA") and the former Michigan Environmental Response Act ("MERA") (both repealed and replaced by the current MEPA in 1995) were properly considered as establishing that they had, and

-16-

had violated, a duty of care to the lake-owner:

> [T]he purpose of the statutes is to prevent environmental contamination and to promote compensation for remediation, and that liability flows from anyone fitting the definition of a responsible party [to] any member of the public who incurs response costs or whose natural resources are injured by such contamination. We therefore conclude that the statutes were intended to prevent precisely this type of injury and that plaintiff was within the class of persons intended to be protected by the statutes.
>
> * * *
>
> Finally, we believe that the burdens and consequences of imposing a duty on [the corporate defendant] are no harsher than the liability already imposed on it by the MERA and the MEPA. Thus, we conclude that the trial court did not err in finding that [corporate defendant] had a duty of care toward plaintiff.

*Cipri*, 596 N.W.2d at 628-29 and 629, 235 Mich. App. at 16-17 and 18.

If the plaintiff satisfies these two criteria and establishes the rebuttable presumption of negligence due to violation of a statute, the defendant must proffer a legal excuse for violating the statute. "Absent a legally sufficient excuse, a jury may infer negligence on the basis of the violation and, if the violation of the statute was a proximate cause of the injury, may return a verdict for the plaintiff." *Sanford St. Local Dev. Corp. v. Textron, Inc.*, 768 F. Supp. 1218, 1224 (W.D. Mich. 1991) (Gibson, C.J.) (applying Michigan law and citing *Klanseck v. Anderson Sales & Serv.*, 426 Mich. 78, 86-87, 393 N.W.2d 356, 360 (1986)), *vac'd o.g.*, 805 F. Supp.2d 29 (W.D. Mich. 1991).

BEF does not seek to dismiss the Lozars' negligence claim in its entirety, nor even its use of the negligence *per se* theory in its entirety. Rather, BEF seeks to dismiss the negligence claim only to the extent that it relies on a negligence *per se* theory predicated on violations of CERCLA, RCRA, and the SDWA. BEF's instant motion does not seek to dismiss the negligence count to the extent that it claims negligence *per se* based on an alleged violation of Michigan statutes or ordinances.

The negligence claim, count one, is contained at paragraphs 406-444 of the second amended

complaint. BEF argues that these counts should be dismissed for failure to state a claim on which relief can be granted, to the extent that the claim is based on the standards of care identified in CERCLA, RCRA, and SDWA. "When fairly read," BEF argues, the complaint fails to identify any breach of these three federal statutes, because it fails to make "any allegation that the fruit processing wastewater used for irrigation by Birds Eye pursuant to" an MDEQ permit was a "hazardous waste" governed by those statutes. MTD at 1. BEF relies on the post-*Twombley* principle that to survive a motion to dismiss for failure to state a claim, "'the complaint must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory. Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice.'" MTD at 2 (quoting *Eidson v. State of Tennessee Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007)).

<u>The Lozars State a Claim for Negligence *Per Se* based on Alleged Violation of CERCLA</u>

CERCLA is a comprehensive environmental statute principally designed to effect two goals: (1) the cleanup of toxic-waste sites and (2) the compensation of those who have attended to the remediation of environmental hazards. *Organic Chemicals Site PRP Group v. Total Petroleum, Inc.*, 6 F. Supp.2d 660, 662-63 (W.D. Mich. 1998) (Enslen, C.J.) (citing *Meghri v. KFC Western*, 516 U.S. 479, 483 (1996) (O'Connor, J., for unanimous Court) (citing *Gen. Elec. Co. v. Litton Indus. Automation Sys., Inc.*, 920 F.2d 1415, 1422 (8th Cir. 1990) (the "two . . . main purposes of CERCLA are prompt cleanup of hazardous waste sites and imposition of all cleanup costs on the responsible party"))).

As to any claim for negligence *per se* based on violations of CERCLA, BEF points out that

the Lozars cite only the general liability provision of CERCLA, *see* 2d Am Comp ¶ 418 (citing 42 U.S.C. § 103(1)), rather than specifying any one of the 28 sections of the pertinent subchapter of CERCLA.  BEF relies on *Brewer v. Ryan*, 680 F. Supp. 1176, 1182 (M.D. Tenn. 1988), where the district court dismissed a RCRA claim because it was based on "sweeping legal conclusions cast in the form of factual allegations" and failed to identify the particular hazardous substance which the defendants allegedly stored, dumped, or disposed of in violation of RCRA.  *See* MTD at 5.

Indeed, it would have been preferable for the Lozars to cite specific subsections rather than only the general liability provision.  And it would have been helpful, for easier, quicker reading, to have one single paragraph of the complaint which specified particular known or suspected contaminants whose release are believed to comprise a violation of each such statutory subsection.

But it cannot be said that the complaint fails to give BEF fair notice of the nature and extent of its alleged misconduct and that conduct's alleged violation of CERCLA, even after *Twombley*, *Erickson*, and *Iqbal* arguably raised the hurdle which a plaintiff must clear in order to state a claim on which relief can be granted.  Preliminarily, there is no doubt that the second amended complaint states a claim as to BEF being a "person" covered by CERCLA.  *See* 42 U.S.C. § 9601(21) (defining person broadly as "an individual, firm, *corporation*, association, partnership, joint venture, *commercial entity*, United States government, State, municipality, commission, political subdivision of a State, or any interstate body.") (emphasis added).

More specifically, paragraph 418 of the second amended complaint notes that CERCLA prohibits a facility owner from releasing "hazardous substances" into "groundwater" which serves as a "drinking water supply."  The second amended complaint certainly states a claim as to the "release" element of that prohibition.  Subject to exclusions that BEF does not contend are

applicable here – workplace injuries, engine emissions, nuclear power, and fertilizer – CERCLA defines "release" broadly as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, ejecting, escaping, leaching, dumping or disposing into the environment . . . ." 42 U.S.C. § 9601(22). Given the ordinary and natural understanding of these words, the alleged spray irrigation, *see inter alia* 2d Am Comp ¶ 43, qualifies as a release at least in the form of emitting, discharging, or ejecting, while the alleged burial of cans and fruit-pit waste in the ground as a cause of contamination qualifies as a release at least in the form of escaping, leaching, and/or dumping.

Reading the rest of the complaint alerts BEF of the identity of the hazardous substances or contaminants to which the Lozars refer. For example, paragraph 418 specifically refers to arsenic or manganese as prohibited by another statute (RCRA), and paragraph 43 more broadly alleges, without confinement to a particular statute, that "[c]ontaminants of concern, including iron, manganese, arsenic, chloride, and sodium, are associated with the spray field operations and the former un-permitted landfills" on the Fennville premises. Paragraph 42, which is also not confined to a particular statute, alleges clearly that BEF "has buried debris including cans and fruit pit waste in the soil" of the Fennville facility and that this debris "could be a significant source of the potential impacts to soil and groundwater in addition to the spray irrigation discharge."

These allegations adequately put BEF on notice that the plaintiffs are claiming it violated CERCLA by causing the release – directly or by migration and the "plume" of contaminants – of these substances into soil and groundwater outside its own property. Nor can BEF reasonably claim that it was not put on notice, or was not aware that, or does not believe that these constitute "contaminants" under CERCLA, 42 U.S.C. § 9601(33) ("any element, substance, compound, or mixture, including disease-causing agents, which after release into the environment and upon

exposure, ingestion, inhalation, or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will or may reasonably be anticipated to cause death, disease abnormalities, cancer, genetic mutation, physiological malfunctions (including malfunctions in reproduction), or physical deformations, in such organisms or their offspring . . . ."). Nor does BEF contend that any of these allegedly improperly-released substances qualify for the petroleum / natural gas exclusion contained in CERCLA's definition of "contaminants", *see* 42 U.S.C. § 9601(33) (cross-referencing 42 U.S.C. § 9601(14)(A)-(F)), such that their release would not constitute the unauthorized release of "contaminants" in violation of CERCLA.

Finally, many paragraphs of the second amended complaint allege or allow the obvious inference that plaintiffs obtain drinking water from a well, which in its ordinary and natural meaning is understood to draw water from the ground beneath or very near their homes in Fennville. Generally, paragraph 421 alleges that "city is unavailable" to the plaintiffs' property, while paragraph 427 refers to "[c]ontaminants of the type discovered *in Plaintiff[s'] wells . . . .*". *See* 2d Am Comp ¶¶ 421 and 427 (emphasis added).

In addition, BEF was put on more detailed notice that the plaintiffs rely on wells for their drinking water by 2d Am Comp ¶¶ 65 (reference to Lozars' well having unsafe level of arsenic); *id.* ¶ 76 (Cortezes installed new well when they bought their home in 2000); *id.* ¶ 95 (Bustillos' well); *id.* ¶ 104 (Rodriguezes dug a second well in 1993 and the water was equally contaminated as water in their first well); *id.* ¶ 136-37 (Nauta paid $5,000 to drill a second well, but it is unusable due to contamination); *id.* ¶ 151 (Martinezes re-dug well from 25 feet to 75 feet but still contaminated); *id.* ¶ 159 (Deana and Harold Hicks had to replace their well due to contamination); *id.* ¶ 172 (when

untreated, Clifton and Jennifer Hicks' well water turns everything it touches to a rust orange color); *id.* ¶ 278 (Jose Fernandez had to dig a deeper well due to contamination); *id.* ¶ 318 (San Juan Benevides re-drilled his well to 100 feet, but the water quality did not improve); *id.* ¶ 341 (Felipa Diaz had to re-drill her well twice in two years); *id.* ¶ 393 (Roger and Michelle Martin have to replace their "well points" every two years due to contamination, and had to replace their well pump motor); *id.* ¶ 405 (Francisco and Maria Rodriguez tried to re-drill their well). Thus, the second amended complaint adequately puts BEF on notice of the allegation that the soil and groundwater allegedly contaminated by its release of contaminants, constitute part of the "drinking water supply" of these plaintiffs and their household members as CERCLA defines that term. *See* CERCLA, 42 U.S.C. § 9601(7) (defining drinking water supply as *"any raw or finished water source that is or may be used* by a public water system" as defined in the SDWA, 42 U.S.C. § 300f *et seq.*, "or *as drinking water by one or more individuals*") (emphasis added).

Lozars Do *Not* State a Claim for Negligence *Per Se* Based on Alleged Violation of SDWA

To the extent that the negligence claim is based on negligence *per se* from a violation of the federal SDWA, BEF notes that the second amended complaint cites only one specific provision of the SDWA, 42 U.S.C. § 300h(d)(2) – a provision which addresses only the "underground injection chemicals into a body of water" – yet the second amended complaint never even alleges that Birdseye conducts any such underground injection. *See* MTD at 5-6. Birdseye points out that the SDWA, 42 U.S.C. § 300h(d)(1), defines underground injection as "the subsurface emplacement of fluids by well injection", and the Lozars do not allege that Birdseye operated or operates an injection well on the premises . *See* MTD at 6. The court agrees that the allegations made in the second

amended complaint do not directly state, nor could they reasonably support the inference that BEF

or any predecessor owner/operator of the Fennville facility operates or operated an injection well

on the premises. Accordingly, the court determines that the plaintiffs' second amended complaint

does not state a claim on which relief can be granted for negligence based on the violation of the

federal Safe Drinking Water Act.

Unlike CERCLA, the "RCRA is not principally designed to effectuate the cleanup of toxic

waste sites or to compensate those who have attended to the remediation of environmental hazards."

*Meghri v. KFC Western*, 516 U.S. 479, 483 (1996) (O'Connor, J., for unanimous Court). Rather,

RCRA's primary purpose is to "reduce the generation of hazardous waste" in the first instance, "and

to ensure the proper treatment, storage, and disposal of" whatever waste is nonetheless generated

"'so as to minimize the present and future threat to human health and the environment.'" *Meghri*,

516 U.S. at 483 (quoting 42 U.S.C. § 6902(b)).

RCRA defines hazardous waste as

a solid waste, or combination of solid wastes, which because of its quantity,
concentration, or physical, chemical, or infectious characteristics may

(A)     cause, or significantly contribute to an increase in mortality or an increase in
serious irreversible, or incapacitating reversible, illness; or

(B)     pose a substantial present or potential hazard to human health or the
environment when improperly treated, stored, transported, or disposed of, or
otherwise managed.

42 U.S.C. § 6903(5). In turn, RCRA defines solid waste as

any garbage, refuse, sludge from a wastewater treatment plant, water supply
treatment plant, or air pollution control facility or other discarded material, including
sold, liquid, semisolid or contained gaseous material resulting from industrial,
commercial, mining, and agricultural operations, and from community activities,

*but does not include* solid or dissolved material in domestic sewage, or solid or

dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 1342 of title 33, or source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended (68 Stat. 923) [42 U.S.C. § 2011 *et seq.*].

42 U.S.C. § 6903(27) (emphasis added, paragraph break added).[3]

To the extent that the negligence claim is based on negligence *per se* from a violation of the federal RCRA, BEF notes that the second amended complaint cites only two provisions of RCRA: 42 U.S.C. § 6924(d)(1) and § 6924(d)(2)(B)(I), which prohibit the disposal of hazardous wastes "containing" arsenic at levels greater than 500 milligrams per liter. BEF asserts that

> [n]owhere do the allegations of the second amended complaint indicate that the organic wastewater that Birds Eye sprays on its fields 'contains' *any* arsenic, let alone in quantities [sic, concentrations] that exceed 500 mg/l. Moreover, Plaintiffs fail to identity any testing that could support a finding that Birds Eye disposed of arsenic on land in concentrations above 500 mg/l. Instead, they allege that certain metals are present in soil or groundwater in the area, or that those metals are associated, directly or indirectly, with Birds Eye's irrigation. These minimal allegations are insufficient to implicate any provision of RCRA and cannot serve to ground a negligence claim on [a violation of] this federal environmental statute.

MTD at 6-7 (citing 2d Am Comp ¶¶ 40, 43, 52, and 423). BEF's argument on this score is unavailing, because this is a motion merely testing whether the second amended complaint states a claim for RCRA violation, not a summary-judgment motion testing the sufficiency of the plaintiffs' evidence to permit a factfinder to find a violation. With much discovery ahead, it is eminently reasonable for the plaintiffs to provide the data and inferences that are currently available to them, as to apparent arsenic levels and the source of any unsafe arsenic concentrations in their soil and groundwater. If, after the completion of discovery, BEF believes that the plaintiffs are unable

---

[3]

Sludge is "any solid, semisolid or liquid waste generated from a municipal, commercial, or industrial wastewater treatment plant, water supply treatment plant, or air pollution control facility or any other such waste having similar characteristics and effects." 42 U.S.C. § 6903(26A). For RCRA's definitions of "storage" and "treatment", *see* 42 U.S.C. § 6903(33) and (34).

to present evidence supporting a finding that it caused concentrations of arsenic or other substances to exceed legally permitted levels on plaintiffs' property or in plaintiffs' water, BEF can test that position by moving for summary judgment. At this early stage of the case, the second amended complaint puts BEF adequately on notice of the existence and fundamental nature of the RCRA claim against it. Specifically, it is obvious from the second amended complaint that the plaintiffs are alleging that BEF violated RCRA by improperly treating, storing and/or disposing of several substances – including arsenic and manganese – which arguably qualify as hazardous wastes, at least in certain concentrations, as defined by 42 U.S.C. § 6903(5) (defining "hazardous waste" as a solid waste or wastes with certain characteristics or effects) and 42 U.S.C. § 6903(defining "solid waste").

**DISCUSSION:**

**Count 2, Claim for Remediation and Response Costs**

To prevail on a cost-recovery claim under CERCLA, a private party[4] must establish that:

––––––––––––––––––

4

As the Supreme Court has explained, "[t]wo provisions of . . . CERCLA . . . – §§ 107(a) and 113(f) – allow private parties to recover expenses associated with cleaning up contaminated sites." *US v. Atlantic Research Corp.*, 551 U.S. 128, 131, 127 S.Ct. 2331, 2333 (2007) (Thomas, J., for a unanimous Court) (citing 42 U.S.C. § 9607(a) and § 9613(f)).

The Supreme Court distinguishes between two recovery provisions of CERCLA. Section 107(a) permits recovery of cleanup costs but does not create a right to contribution. *A private party may recover under § 107(a) without any establishment of liability to a third party.* * * * [T]he remedies available in §§ 107(a) and 113(f) complement each other by providing causes of action to persons in different procedural circumstances.

Section 113(f)(1) authorizes a contribution action [by] PRPs with common liability stemming from an action instituted under § 106 or § 107(a). And § 107(a) permits cost recovery (as distinct from contribution) by a private party that has itself incurred cleanup costs.

*Atlantic Research*, 551 U.S. at 139 (emphasis added) (internal citations & quotation marks omitted).

(1)     the site on which the hazardous substances are contained is a "facility" as defined by 42 U.S.C. § 9601(9);

(2)     a "release" or "threatened release" of a hazardous substance from the facility has occurred as defined by 42 U.S.C. § 9607(a)(4) (Liability section);

(3)     such release or threatened release has caused the plaintiff to incur response costs which were "necessary" and "consistent with the national contingency plan" per 42 U.S.C. § 9607(a)(4) and (a)(4)(B); and

(4)     the defendant is within one of the four classes of persons/entities subject to the liability provisions of CERCLA section 107(a), 42 U.S.C. § 9607(a).

*Organic Chemicals Site PRP Group v. Total Petroleum, Inc.*, 6 F. Supp.2d 660, 663 (W.D. Mich. 1998) (Enslen, C.J.) (citing, *inter alia*, *Pierson Sand & Gravel, Inc. v. Pierson Twp.*, No. 94-1472, 89 F.3d 835, 1996 WL 338624, *1-2 (6th Cir. June 18, 1996) (Keith, Jones, Siler)); *accord 9201 San Leandro, LLC v. Precision Castparts Corp.*, 548 F. Supp.2d 732, 734 (N.D. Cal. 2008) (quoting *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1152 (9th Cir. 1989)).  The national contingency plan to which CERCLA refers is the plan published under 33 U.S.C. § 1321(c).  *See* 42 U.S.C. § 9601(31).

---

BEF has not contended that any of these plaintiffs caused or contributed in any way to whatever groundwater or soil contamination is present on and around the plaintiffs' properties and/or the BEF facility premises.  In other words, BEF has not contended that any of these plaintiffs is a "potentially responsible party" ("PRP") for purposes of CERCLA.  Accordingly, until and unless the EPA determines that any of the plaintiffs is a PRP, it appears that the plaintiffs may seek recovery of costs under CERCLA § 107(a).  Section 113(f)(1) is inapposite because it applies only to contribution recovery claims by PRPs.

"In the CERCLA scheme, it is the EPA, which initially determines who is a 'responsible party.'"  *City of Modesto Redev. Agency v. Dow Chem. Co.*, 2005 WL 1171998, *10 (Cal. Super. Apr. 11, 2005) (citing 42 U.S.C. § 9604 and *Pacific Resins & Chems., Inc. v. US*, 654 F. Supp. 249, 251 (W.D. Wash. 1986)).  "That determination is not judicially reviewable until completion of the EPA-mandated cleanup."  *City of Modesto Redev. Agency*, 2005 WL 1171998 at *10 (citing *Razore v. Tulalip Tribes of Wash.*, 66 F.3d 236, 239 (9th Cir. 1995) (citing 42 U.S.C. § 9613(h))).

Other than incorporating the previous allegations, stating that damages are within the court's jurisdictional amount, and seeking attorneys' fees under 42 U.S.C. § 9659, the Lozars' Remediation/Response Cost claim allegations are contained in paragraphs 446 through 459 of the second amended complaint.

BEF argues that count two's claim for Remediation and Response Costs should be dismissed for failure to state a claim on which relief can be granted for two independent reasons. First, BEF contends that because the Lozars fail to state a claim for violation of CERCLA, RCRA and SWDA, they cannot seek remediation and response costs allegedly incurred as a result of such violations. *See* MTD at 1. As noted above, the court agrees with BEF that the plaintiffs' count one fails to state a claim for negligence based on a violation of the SDWA. Therefore, because there are no allegations that BEF violated some particular provision of the SDWA *and* sufficient specific plausible allegations as to how BEF allegedly violated that provision, the plaintiffs' count two claim for recovery of response/remediation costs fails as to any costs allegedly incurred as a result of an alleged violation of the SDWA.

Second, BEF contends that even if the Lozars's count one (negligence / negligence *per se* claim) stated a claim for violation of CERCLA and RCRA, the complaint fails to sufficiently allege that many of the dozens of plaintiffs actually have incurred any remediation/response costs as a result of BEF's alleged violation of those two federal statutes. As the defendants argue,

> There are now 40 Plaintiffs in this lawsuit. As Plaintiffs acknowledge through the plain allegations in the Second Amended Complaint, 26 of them have no claim for recovery of response costs under *any* environmental statute because they have not alleged that they have, in fact, incurred any response costs. * * *

> While ¶ 456 of the Second Amended Complaint purports to contain "a non-exclusive" [sic, non-exhaustive] list of those Plaintiffs who allegedly did incur response costs, the detailed allegations for each of the Plaintiffs in ¶¶ 56-405 show

that no other Plaintiffs alleged any such costs.

What is clear at the pleading stage is that a cost recovery claim under Count II must
be dismissed at this time as to all Plaintiffs except those identified in Paragraph 456
of the Second Amended Complaint.

MTD at 7-8.[5]

While the complaint might have been drafted with more precision, it does provide the

requisite "direct or inferential allegations" pertaining to each of the four elements of a CERCLA

cost-recovery claim generally. First, paragraphs 446-447 of the second amended complaint

adequately state a claim that the BEF Fennville plant constitutes a "facility" as defined by 42 U.S.C.

§ 9601(9), namely

> *any building, structure, installation, equipment*, pipe or pipeline (including any pipe
> into a sewer or publicly owned treatment works), *well, pit, pond*, lagoon,
> impoundment, *ditch*, landfill, storage container, motor vehicle, rolling stock, or
> aircraft, or (B) any site where a hazardous substance has been deposited, stored,
> disposed of, or placed, or otherwise come to be located; but does not include any
> consumer product in consumer use or any vessel.

Emphasis added; *see also* 42 U.S.C. § 9601(18) (defining "onshore facility"). Second, paragraphs

41-43 and 419 allege that a "release" or "threatened release" of a hazardous substance from the

facility has occurred as defined by CERCLA's 42 U.S.C. § 9607(a)(4) (Liability section). Those

paragraphs of the Lozars' complaint make clear, for instance, that the specific hazardous substances

---

[5]

Any question about the Lozars' ultimate ability to establish BEF's responsibility for the
groundwater contamination itself does not subject their remediation/response-cost claim to 12(b)(6)
dismissal. *See ITT Indus., Inc. v. BorgWarner, Inc.*, 506 F.3d 452, 458 n. 2 (6th Cir. 2007)
("Defendants also argue that Plaintiffs' [CERCLA] cost recovery claim must be dismissed based on
Plaintiff's failure to demonstrate that Defendants were responsible for contamination in its
Streamlined Study. However, given that this appeal arises from a dismissal for failure to state a
claim, we construe all allegations in a light most favorable to [the] nonmoving party and accept all
[its] allegations as true. Here, Plaintiff has alleged that Defendants are responsible for
contamination at both sites.").

to which they refer are not petroleum/gas substances which are excluded from CERCLA's coverage. *Cf. 9201 San Leandro, LLC v. Precision Castparts Corp.*, 548 F. Supp.2d 732, 735 (N.D. Cal. 2008) (noting that despite the liberal pleading standard observed on a Rule 12(b)(6) motion to dismiss, the complaint fell just short, but plaintiffs would be granted leave to amend the complaint to more particularly and sufficiently allege the release of non-petroleum contaminants).

Third, the plaintiffs state a claim as to the "necessary response costs" element of a CERCLA response-cost claim by virtue of the many paragraphs of the second amended complaint which allege that the contaminated groundwater (allegedly caused by releases from BEF's property) made it necessary for various plaintiffs to re-drill or re-dig existing wells or install a new well, replace well points after only two years (in one instance), and (inferentially) to obtain clean and safe drinking water at their own expense (in the case of plaintiffs who allege that their water is unsafe but BEF is not providing them with water, *see, e.g.,* 2d Am Comp ).

The second amended complaint also states a claim on which relief can be granted as to the fourth element of a CERCLA response-cost recovery claim, i.e., that BEF is "within one of the four classes of persons/entities subject to the liability provisions of CERCLA section 107(a), 42 U.S.C. § 9607(a)." BEF has not even contended that it is not within a class of persons potentially subject to CERCLA liability, including, on suitable proof, liability for response/remediation costs. Nor has BEF contended that it is not an entity potentially subject to RCRA liability, including, on suitable proof, liability for response/remediation costs.

As noted above, BEF reasonably points out that the second amended complaint does not specifically allege that all of the plaintiffs have incurred response/remediation costs which are recoverable under CERCLA and/or RCRA and/or Michigan statute. At this juncture, however, there

is no scheduling order governing the case, and no deadlines for discovery and motion practice.  The fairest course of action is to permit the plaintiffs an opportunity to remedy the lack of specificity and completeness of their allegations on this score.  The court will permit them to file a third amended complaint, by a date certain, which sets forth all specific allegations they wish to assert with regard to the timing, nature, and extent of allegedly-recoverable response/remediation costs which *each particular plaintiff* has already incurred.  (The plaintiffs have the option, of course, of filing a third amended complaint which makes clear that some of the plaintiffs are not asserting a response/remediation cost-recovery claim.)

The court reminds the plaintiffs that "CERCLA does not authorize the recovery of costs to be incurred in the future."  *City of Modesto Redev. Agency v. Dow Chem. Co.*, 2005 WL 1171998, *10 (Cal. Super. Apr. 11, 2005) (citing *In re Dant & Russell, Inc.*, 951 F.2d 246, 249-50 (9th Cir. 1991)).  "Under CERCLA, *after* spending money in response to an environmental hazard, a party may then obtain reimbursement for its initial outlays, as well as a declaration that the responsible parties will have continuing responsibility for the costs of finishing the job."  *Modesto Redev. Agency*, 2005 WL 1171998 at *10 (emphasis added).  In other words, CERCLA authorizes reimbursement of past response costs and declaratory relief as to future response costs.


## ORDER

Defendants' motion to dismiss portions of counts one and portions of count two of the second amended complaint [doc. # 33] is **GRANTED in part** and **DENIED in part**.

Defendant's motion to dismiss is **GRANTED to the following extent**:

–   The court **DISMISSES the portion of count 1 (negligence) which** claims that defendant committed negligence *per se* by violating the SDWA.

-30-

–     The court **DISMISSES the portion of count 2 (response costs) which** seeks recovery of response costs for defendant's alleged violation of the SDWA.

Defendant's motion to dismiss is **DENIED to the following extent**:

–     The court *declines* to dismiss the portion of count one (negligence) which claims that defendant committed negligence *per se* by violating CERCLA and /or RCRA.

–     The court *declines* to dismiss the portion of count two (response costs) **which** seeks recovery of response costs attributable to alleged violations of CERCLA and/or RCRA.

**The following claims remain in the case:**

•     the portion of count one (negligence) which claims that defendant committed negligence without reliance on a negligence *per se* theory;

•     the portion of count one (negligence) which claims that defendant committed negligence *per se* by violating CERCLA and/or RCRA and/or Michigan statute;

•     the portion of count two (response costs) which seeks recovery of response costs incurred by any plaintiffs due to defendant's alleged violation of CERCLA and/or RCRA and/or Michigan statute;

•     all of count three, which was not the subject of the instant motion

**No later than Monday, March 1, 2010**, the plaintiffs **SHALL FILE a third amended complaint** which amends paragraph 456 only. The amended paragraph 456 shall:

–     provide all available specific information regarding the nature, timing, and extent of response/remediation costs for which each plaintiff seeks recovery;

–     specifies the statute and statutory section(s) under which each plaintiff, or all of them, seek recovery of response/remediation costs;

–     allege specific facts showing each plaintiff's compliance with the National Contingency Plan.[6]

---

[6]

As the Michigan Supreme Court has explained, "The National Contingency Plan is described

-31-

This does <u>not</u> constitute leave to amend the complaint in any other respect.

Motions for leave to further amend will be subject to the standard of FED. R. CIV. P. 16(b).

Because this order does not dispose of all claims as to all parties, it is <u>not</u> a final order, and it is not immediately appealable.  *See Griffin v. Reznick*, – F. Supp.2d –, –, 2008 WL 5110528, *10 (W.D. Mich. Dec. 2, 2008) (Maloney, C.J.) (citing, *inter alia*, *Tanner Co. v. US*, 575 F.2d 101, 102 (6th Cir. 1978))).

**IT IS SO ORDERED** on this  22nd  day of December 2009.

/s/ Paul L. Maloney
Honorable Paul L. Maloney
Chief United States District Judge

<hr>

at 42 U.S.C. § 9605 and is set forth at 40 CFR Part 300 *et* seq.  That plan 'sets forth procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants . . . .'" *Pierson Sand & Gravel, Inc. v. Keeler Bras Co.*, 460 Mich. 372, 383, 596 N.W.2d 153, 158-59 (Mich. 1999) (citing *US v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1500 n.8 (6th Cir. 1989)).